Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
03/08/2024 09:15 AM CST

STATE OF NEBRASKA, APPELLEE, V.
DESHAWN L. GLEATON, JR., APPELLANT.
___ N.W.3d ___

Filed March 8, 2024.    No. S-22-560.

1. **Expert Witnesses: Appeal and Error.** The standard for reviewing the admissibility of expert testimony is abuse of discretion.

2. **Judgments: Expert Witnesses: Words and Phrases.** An abuse of discretion in the trial court's determination under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001), occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.

3. **Courts: Expert Witnesses.** Under the *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001), framework, the trial court acts as a gatekeeper to ensure the evidentiary relevance and reliability of an expert's opinion.

4. **Trial: Expert Witnesses: Intent.** The purpose of this gatekeeping function is to ensure that the courtroom door remains closed to "junk science" that might unduly influence the jury, while admitting reliable expert testimony that will assist the trier of fact.

5. **Trial: Expert Witnesses.** A trial court can consider several nonexclusive factors in determining the reliability of an expert's opinion: (1) whether a theory or technique can be (and has been) tested; (2) whether it has been subjected to peer review and publication; (3) whether, in respect to a particular technique, there is a high known or potential rate of error; (4) whether there are standards controlling the technique's operation; and (5) whether the theory or technique enjoys general acceptance within a relevant scientific community.

6. **Trial: Prosecuting Attorneys: Words and Phrases.** Prosecutorial misconduct encompasses conduct that violates legal or ethical standards for

various contexts because the conduct will or may undermine a defendant's right to a fair trial.

7. **Trial: Prosecuting Attorneys: Juries.** Prosecutors are charged with the duty to conduct criminal trials in such a manner that the accused may have a fair and impartial trial, and prosecutors are not to inflame the prejudices or excite the passions of the jury against the accused.

8. \_\_\_\_: \_\_\_\_: \_\_\_\_. A prosecutor's conduct that does not mislead and unduly influence the jury does not constitute misconduct.

9. **Trial: Prosecuting Attorneys.** In assessing allegations of prosecutorial misconduct in closing arguments, a court first determines whether the prosecutor's remarks were improper. It is then necessary to determine the extent to which the improper remarks had a prejudicial effect on the defendant's right to a fair trial.

10. **Sentences: Evidence: Appeal and Error.** Absent an abuse of discretion, an appellate court will not disturb a trial court's rulings as to the source and type of evidence and information that may be used in determining the kind and extent of punishment to be imposed.

11. **Sentences: Appeal and Error.** A sentence imposed within the statutory limits will not be disturbed on appeal in the absence of an abuse of discretion by the trial court.

12. **Homicide: Sentences.** A defendant is not entitled to credit for time served against a life sentence; however, when the defendant receives a sentence consecutive to the life sentence that has maximum and minimum terms, the defendant is entitled to receive credit for time served against the consecutive sentence.

Appeal from the District Court for Madison County: James G. Kube, Judge. Affirmed as modified.

Robert W. Kortus, of Nebraska Commission on Public Advocacy, for appellant.

Michael T. Hilgers, Attorney General, and Melissa R. Vincent for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Papik, J.

DeShawn L. Gleaton, Jr., appeals after he was convicted of and sentenced for first degree murder, use of a firearm to

commit a felony, possession of a firearm by a prohibited person, and witness tampering. At Gleaton's jury trial, several forms of evidence implicated Gleaton in the shooting death of Hailey Christiansen. On appeal, Gleaton argues that the district court erred in admitting expert testimony regarding cell phone location data, in overruling defense objections to statements of the prosecutor during closing argument, and in declining to strike certain victim impact material from the presentence investigation report (PSR). Additionally, Gleaton argues the district court committed judicial misconduct during sentencing. We find no merit to Gleaton's contentions, but do find plain error in sentencing. Accordingly, we affirm Gleaton's convictions and affirm his sentences as modified.

## I. BACKGROUND

On July 24, 2020, Christiansen died from a single gunshot wound to the chest. She was shot in her home in Norfolk, Nebraska. Gleaton and Christiansen had previously been in a dating relationship, and, earlier that month, Gleaton had been charged with third degree domestic assault and first degree criminal trespass in connection with an alleged altercation with Christiansen. At the time Christiansen was shot, Gleaton was free on bond.

Evidence at trial established that Gleaton called Christiansen's cell phone several times on the evening of July 23, 2020, and in the early morning hours of July 24. Christiansen's friends answered some of the calls, and Gleaton then demanded to speak to Christiansen. On the morning of July 24, Christiansen's next-door neighbor saw Gleaton enter Christiansen's residence. At approximately 6:45 a.m., other neighbors heard a gunshot and saw Christiansen exit her front door, screaming. Neighbors, law enforcement, and paramedics then assisted Christiansen as she moved in and out of consciousness. When paramedics asked Christiansen who shot her, she said she did not know. At that time, Christiansen was repeatedly telling paramedics to tell her son that she loved him. Christiansen died at a hospital later that day.

At trial, the State offered two self-recorded Snapchat videos of Gleaton, created in a social media application shortly after the time of the shooting. In one of the videos, Gleaton is heard saying, "Yeah, I shot the bitch," and is also seen holding a black semiautomatic pistol. In the other video, Gleaton said, "I'm sorry but it had to be done. But they probably kill me."

After Gleaton was arrested, he was interviewed by law enforcement. During the interview, Gleaton admitted that he was with Christiansen on the morning of the shooting and that he shot Christiansen one time. According to the interviewer, Gleaton explained that he was upset because Christiansen said she was going to send him back to jail and that he felt he had "no choice" but to shoot her.

A jury convicted Gleaton on all counts. Following the convictions, the district court sentenced Gleaton to life imprisonment for first degree murder, 25 to 30 years' imprisonment for possession of a firearm by a prohibited person, 40 to 50 years' imprisonment for use of a firearm to commit a felony, and to 1 to 2 years' imprisonment for witness tampering. The district court granted Gleaton 413 days' credit for time served on his life sentence. Gleaton timely appealed.

Additional procedural history and evidence, when relevant, will be discussed in the analysis section below.

## II. ASSIGNMENTS OF ERROR

Gleaton assigns five errors on appeal. We have consolidated and paraphrased those errors as follows: The district court erred in (1) admitting expert testimony that relied on cell phone location data, (2) overruling defense objections to statements of the prosecutor made during closing argument, (3) declining to strike challenged victim impact material from the PSR, and (4) committing "[j]udicial [m]isconduct" during sentencing.

Additionally, the State asserts that the district court committed plain error when it applied 413 days' credit for time served to Gleaton's life sentence.

## III. ANALYSIS

### 1. Expert Testimony

Gleaton assigns that the district court erred in receiving expert testimony of Robert Hurley concerning the locations of Gleaton's and Christiansen's cell phones. Hurley, a criminal investigator with the Lincoln Police Department, relied on cell phone location data known as round-trip time data (RTT data) to provide opinions about the location and movement of Gleaton's and Christiansen's phones on the day of Christiansen's death.

### (a) Additional Background

Prior to trial, Gleaton filed a motion in limine that challenged the admissibility of expert testimony from the State based on RTT data. Gleaton argued that any such testimony should be excluded as unreliable under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001) (*Daubert/Schafersman*).

The district court held a pretrial hearing on Gleaton's motion at which Hurley testified. Hurley testified that he had been employed by the Lincoln Police Department for 31 years and had worked as a criminal investigator since 2006. Hurley testified that he also served in the U.S. Army and worked as a communications officer for several years, specializing in setting up cellular networks in the field and providing oversight for radio and satellite communications. Hurley testified that he started using his military training and experience to analyze cell phone records when he began his work as a criminal investigator.

Hurley testified that Verizon was the cellular service provider for the phones belonging to Gleaton and Christiansen. Hurley testified that RTT data is one type of data Verizon generates. RTT data includes the amount of time it takes for a cell phone signal to travel between the cell phone and the tower to which it connects, and back again. Verizon claims to

use RTT data to track customers' data usage and to improve its network.

Hurley testified to how he uses RTT data in his work as a criminal investigator. He explained that cell phones send signals to towers, which are generally triangular in shape and divided into three 120-degree sectors. When a cell phone connects to a tower, cellular data shows the time at which that connection was made and the tower and sector to which the phone connected. In addition to this information, Verizon's RTT data includes the amount of time it takes for the cellular signal to travel to and from the tower, expressed in terms of the distance between the phone and the tower. Based on the distance the RTT data indicates a phone is from a tower at a particular time and the sector to which it connects, Hurley believes he can determine that a phone was somewhere along a 120-degree arc corresponding to that sector at the time at which it connected.

The State offered evidence of prior instances in which Hurley's methodology had been applied. Hurley first applied the methodology when investigating the murder of Sydney Loofe in 2017. See *State v. Trail*, 312 Neb. 843, 981 N.W.2d 269 (2022). Loofe had disappeared, and Hurley used RTT data to search for her remains. Cell phone location data for phones of individuals suspected responsible for Loofe's disappearance indicated that the suspects traveled west from Wilber, Nebraska, to a rural area in Clay County, Nebraska, the day after Loofe was last seen. Hurley used RTT data from the suspects' phones to plot out the locations of their phones during that day. The RTT data indicated that one of the phones remained 3.83 miles away from a tower for an extended period of time on that day; the suspects' residence was 3.83 miles from that tower. Additionally, the RTT data indicated that there were times when the suspects' phones were stationary during their trip west. Hurley plotted where the RTT data showed those phones were located while stationary and suggested that law enforcement search along the road in those

areas. Loofe's remains were discovered in almost all of those areas. Hurley testified that at one location, a body part was found within 20 feet of where the RTT data indicated the phones were stationary.

The State introduced evidence that Hurley also used RTT data to investigate the suspects' movements on the day Loofe was last seen. RTT data showed that on that evening, the suspects' phones were in an area that included a home improvement store at a particular time. Surveillance video showed the suspects in that store at that time. RTT data also showed that the suspects were in an area that included another, similar, store at a particular time. Surveillance video showed the suspects in the latter store at that time.

Hurley testified that, in addition to the Loofe investigation, he had used RTT data in an investigation of a homicide in Lincoln, Nebraska. Hurley testified that he plotted an arc corresponding to where the RTT data showed a phone belonging to a suspect was located at a particular time and that the arc "went right across the house where the homicide occurred." Hurley explained that at the same time the RTT data showed the phone was within an arc that included the house, video from a doorbell camera at the house showed the suspect holding the phone.

The State also introduced evidence at the pretrial hearing that Hurley taught his methodology to Cory Townsend, one of the investigators he worked with during the Loofe investigation. Townsend then used Hurley's methodology in an investigation of another case, in Cuming County, Nebraska. The district court received a transcript of testimony Hurley and Townsend provided in that case regarding RTT data. Townsend testified that in that case, RTT data showed that suspects were in areas that included particular gas stations at two different times, and video surveillance footage confirmed that the suspects were in the gas stations at those times. He also testified that RTT data showed that the suspects were in an area that included a particular intersection for an extended

period of time, and police records of a traffic stop and in-car camera footage from a police car confirmed that the suspects were stopped at that intersection during that time.

Hurley testified that in this case, he analyzed RTT data for a phone belonging to Gleaton and a phone belonging to Christiansen. Hurley testified that in his analysis of RTT data, he utilized software developed by Pen-Link, Ltd. Hurley testified that he had also used Pen-Link software in the Loofe investigation, but to map only tower and sector data, not RTT data. According to Hurley, at the time of the Loofe investigation, the Pen-Link software did not have the ability to map RTT data. In that case, Hurley manually mapped the 120-degree arcs indicated by the RTT data. Hurley testified that, following the Loofe investigation, he helped Pen-Link develop its software so that the software could also map RTT data.

Hurley explained that this case was the first investigation where he utilized Pen-Link software to map RTT data. Hurley entered the Verizon data into the Pen-Link software, and the software then organized and overlaid the data onto a map. Hurley stated that Pen-Link's mapping software is comparable to Google Maps. Hurley was asked if he had ever inserted phone data into Pen-Link software and found that the Pen-Link software analysis was wrong. Hurley stated that he has "not had an issue with Pen-Link [software] interpreting the data correctly." Hurley further explained that if the RTT data is correctly entered into the Pen-Link software, it will "map out the exact same thing [he] could do by hand."

Hurley testified that the RTT data for Gleaton's phone showed that in the early morning hours of July 24, 2020, the phone traveled from Sioux City, Iowa, to Norfolk, Nebraska; that the phone remained in and around Norfolk for several hours; and that at about 6:30 a.m. on July 24, it was within an arc that included Christiansen's home. According to Hurley, RTT data indicated that Gleaton's phone traveled back to Sioux City later that day, traversing through Jackson,

Nebraska, on the way. Hurley testified that RTT data from Christiansen's phone indicated that her phone was in an area that included a particular bar in Norfolk until approximately 2 a.m., that her phone was in an area that included the house of one of her friends until approximately 4 a.m., and that her phone was in a location that included her own house until just after 4:30 a.m., which was the last activity on her phone.

Hurley acknowledged that he could not determine who was using a phone at a particular time or whether the phone was at a specific location or address at a specific time. Gleaton argued that because of those limitations, Hurley's testimony, if allowed, should be appropriately limited.

In a written order following the *Daubert*/*Schafersman* hearing, the district court overruled Gleaton's motion in limine in part. In its order, the district court determined that Hurley's methodology was "repeatable and reliable." The district court referred to evidence that Hurley's methodology had been used and produced reliable results in other criminal investigations.

Although the district court explained that it would generally permit Hurley to testify, it agreed to limit his testimony as requested by Gleaton. The district court ordered that Hurley would "not be allowed to testify that a specific person, such as the owner of a phone, was traveling on a route or located in a certain place." Further, the district court ordered that Hurley would not be allowed to testify that a cell phone "was at a specific address or location," but could testify that "a certain address or location is within an area or arc of convergence where the cell phone communicated with the cell phone tower."

At trial, the State called a Verizon records analyst to provide foundation for the RTT data. She testified that Verizon provided RTT data to law enforcement for phones associated with Gleaton and Christiansen. On cross-examination, she confirmed that RTT data shows the distance between a phone and the tower to which it is connecting. She added, however, that Verizon "can't confirm that it's exact." Defense counsel

then asked "how close or how precise" the RTT data is. The records analyst responded, "Within five or ten miles maybe, roughly." Neither defense counsel nor counsel for the State probed the issue further.

After the testimony of the Verizon records analyst, the State called Hurley to testify. Hurley provided testimony as to what the RTT data showed regarding the movements of Gleaton's and Christiansen's phones consistent with his testimony at the pretrial hearing. On several occasions, the district court sustained defense objections to testimony of Hurley that contravened the limitations the district court placed on Hurley's testimony in response to Gleaton's motion in limine. On cross-examination, Hurley confirmed that there is no way that the RTT data allows him to determine whether a particular person has a phone at a particular time. He also confirmed that his opinions in this case were not that Gleaton's and Christiansen's phones were in specific locations, but that the phones were located somewhere along arcs indicated by the RTT data.

Other evidence at trial was consistent with Hurley's opinions regarding the location of Gleaton's and Christiansen's phones. As noted above, Christiansen's next-door neighbor testified that she saw Gleaton enter Christiansen's residence on the morning Christiansen was shot. In addition, several of Christiansen's friends testified that earlier that day, Christiansen was at the same bar identified by Hurley until approximately 2 a.m., and that she then went to the house of the friend Hurley identified until about 4 a.m., before returning home. Evidence at trial was also introduced that Gleaton was arrested in Sioux City the day after Christiansen was killed and that a vehicle he had been driving for several months was discovered in Jackson.

### (b) Standard of Review

[1,2] The standard for reviewing the admissibility of expert testimony is abuse of discretion. *State v. Simmer*, 304 Neb.

369, 935 N.W.2d 167 (2019). An abuse of discretion in the trial court's *Daubert/Schafersman* determination occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Simmer, supra*.

### (c) Analysis

Gleaton argues that the district court abused its discretion when it allowed Hurley to offer expert opinion testimony based on his interpretation of the RTT data. Because the district court and the parties treated Hurley's testimony as subject to the rules governing the admission of expert opinion testimony, we will do the same for the purposes of this appeal. Before we address Gleaton's arguments, we briefly review the governing legal principles.

The Nebraska Evidence Rules provide: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Neb. Evid. R. 702, Neb. Rev. Stat. § 27-702 (Reissue 2016). The admission of expert testimony under rule 702 is governed by a legal framework initially set forth by the U.S. Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and later adopted by this court in *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001).

[3,4] Under the *Daubert/Schafersman* framework, the trial court acts as a gatekeeper to ensure the evidentiary relevance and reliability of an expert's opinion. *Simmer, supra*. The purpose of this gatekeeping function is to ensure that the courtroom door remains closed to "junk science" that might unduly influence the jury, while admitting reliable expert testimony that will assist the trier of fact. *Id.* The *Daubert/Schafersman* standards require proof of the scientific validity of principles

and methodology utilized by an expert in arriving at the opinion. *Simmer, supra*.

[5] A trial court can consider several nonexclusive factors in determining the reliability of an expert's opinion: (1) whether a theory or technique can be (and has been) tested; (2) whether it has been subjected to peer review and publication; (3) whether, in respect to a particular technique, there is a high known or potential rate of error; (4) whether there are standards controlling the technique's operation; and (5) whether the theory or technique enjoys general acceptance within a relevant scientific community. *Id.* A trial court may consider one or more of those factors when doing so will help determine that testimony's reliability, but the test of reliability is "'flexible'" and the list of specific factors neither necessarily nor exclusively applies to all experts or in every case. See *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999), quoting *Daubert, supra*.

Once the reasoning or methodology of an expert's opinion has been found to be reliable, the trial court must determine whether the expert's reasoning or methodology was properly applied to the facts of the case. See *Carlson v. Okerstrom*, 267 Neb. 397, 675 N.W.2d 89 (2004). The proponent of expert testimony bears the burden of establishing its reliability under *Daubert/Schafersman*. See *State v. Casillas*, 279 Neb. 820, 782 N.W.2d 882 (2010).

A court performing a *Daubert/Schafersman* inquiry should not require absolute certainty. *State v. Hill*, 288 Neb. 767, 851 N.W.2d 670 (2014). Instead, a trial court should admit expert testimony if there are good grounds for the expert's conclusion, even if there could possibly be better grounds for some alternative conclusion. *Id*.

In this appeal, Gleaton mostly renews the same basic arguments that he made about Hurley's testimony in the district court. He argues that evidence of the use of RTT data in prior criminal investigations did not establish that Hurley's opinions in this case were reliable. On this point, Gleaton

emphasizes that some of the prior investigations were focused on rural areas and that Hurley performed them without using the Pen-Link software. In addition, Gleaton argues that the State did not introduce evidence relevant to many of the *Daubert/Schafersman* factors.

In attempting to establish the reliability of Hurley's opinion testimony, the State did rely heavily on evidence regarding the application of Hurley's methodology in prior investigations. Gleaton does not dispute that this evidence seemed to show that Hurley's methodology produced accurate results in those cases. Instead, he contends that because some of those prior investigations were conducted in rural areas and because Hurley did not use the Pen-Link software in those cases, they do not tend to show that his testimony in this case was reliable. We disagree.

We first address Gleaton's point concerning the use of RTT data in rural areas. Using the Sidney Loofe case as an example, Gleaton argues that Hurley was able to successfully use RTT data in that case because the data indicated that the suspects' cell phones were in a rural area and the arcs indicated by the data as potential locations for the cell phones crossed few possible roads where the suspects could have been traveling. Investigators searched in the areas where the arcs intersected those roads and found Loofe's remains. Gleaton observes that some of the RTT data in this case indicated the phones belonging to Gleaton and Christiansen were in a more urban area and that thus, the arcs indicated by the RTT data as possible locations of phones would include many more locations where the phones could have been. In essence, Gleaton argues that Hurley's methodology may have been reliable in a rural area, but that this does not tend to show it was reliable in this case.

Gleaton's argument, however, fails to account for how the RTT data was used in the Loofe case and for Hurley's actual testimony in this case. The RTT data in the Loofe case indicated that the suspects' phones were, for some periods of

time, stopped somewhere along arcs a particular distance from the tower to which the phones had connected. The discovery of Loofe's remains where those arcs intersected with the nearest road provided evidence that the RTT data was accurate in indicating that the phones were located somewhere along the arcs. In this case, Hurley applied the same methodology. He interpreted the RTT data to indicate that the phones of Gleaton and Christiansen were, at given times, somewhere along arcs a certain distance from the towers to which the phones connected. And, as we have explained, the district court prohibited Hurley from testifying that a particular phone was present in a specific location. Hurley testified only that the RTT data indicated that a phone was somewhere along an arc at a given time. The more urban setting of this case may have meant that there were more plausible locations where a phone could have been located along an arc, but an urban setting does not undermine the reliability of Hurley's opinion that a phone was located somewhere along that arc.

Gleaton also argues that Hurley's prior use of RTT data could not establish its reliability in this case because in prior cases, Hurley did not use Pen-Link's software to map the arcs indicated by the RTT data, but mapped the arcs manually. Again, we disagree. Hurley testified that the Pen-Link software takes the RTT data from Verizon and overlays it on a map. He compared the software to Google Maps. He testified that if the RTT data is correctly entered into the Pen-Link software, it will "map out the exact same thing [he] could do by hand." The fact that Hurley used the Pen-Link software in this case rather than mapping the arcs manually as he did in prior cases does not, in our view, render irrelevant his prior, successful use of RTT data. The difference between manual mapping of RTT data and the use of the Pen-Link software appears to be akin to the difference between doing long division by hand and using a calculator. As one federal district court has reasoned, the accuracy of a mapping function can be easily verified, and thus, an expert need not be able to

offer technical knowledge as to how the mapping function works in order to rely on it in offering opinions based on cell site location information. See *U.S. v. Nelson*, 533 F. Supp. 3d 779 (N.D. Cal. 2021).

In addition to his arguments based on perceived differences between this case and prior cases in which Hurley's methodology was employed, Gleaton makes a more general argument: The State failed to offer evidence relevant to several of the *Daubert*/*Schafersman* factors. Here, Gleaton points out that the State did not offer evidence that Hurley's methodology had been subject to peer review and publication, that there were known or potential rates of error, or that Hurley's methodology had attained general acceptance in the relevant scientific community. Gleaton suggests that without such evidence, the State failed to establish the reliability of Hurley's methodology.

We disagree with Gleaton that in the absence of evidence on several of the *Daubert*/*Schafersman* factors, the State failed to show that Hurley's methodology was reliable. For starters, it is well recognized that the absence of evidence on some *Daubert*/*Schafersman* factors does not preclude a demonstration of reliability. As we noted above, the factors first set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), do not necessarily apply in every case and a trial judge has broad latitude to determine whether the factors are "reasonable measures of reliability in a particular case." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999). To that point, some courts have observed that it should come as no surprise that some expert methodologies have not been subject to scientific peer review and publication because they may have few uses outside of criminal investigations and not have interested scientists. See *U.S. v. Reynolds*, 86 F.4th 332 (6th Cir. 2023).

Moreover, we believe that in this case, the district court could reasonably place substantial weight on the evidence of

Hurley's prior, successful use of RTT data in concluding that his opinions were reliable. We reach this conclusion for multiple reasons.

First, we note that there is widespread, if not universal, acceptance of the general idea that because of the way cell phones communicate with towers, it is possible to make determinations about the general locations of phones at particular times. See, e.g., *id.* (noting that it is widely accepted that cell phone's general location can be determined by identifying antenna it connected to at specific time); *State v. Elias*, 314 Neb. 494, 990 N.W.2d 905 (2023) (describing cell site location information evidence); *State v. Brown*, 302 Neb. 53, 921 N.W.2d 804 (2019) (describing nature of cell site location information). Obviously, the State could not establish that Hurley's use of RTT data was reliable solely by pointing to the general acceptance of the reliability of some forms of cell site location data. But here, the evidence tended to show that Hurley applied generally accepted ideas about the ways cell phones communicate with towers and basic geometry to a new type of raw data.

Second, Hurley did not merely assert that RTT data was reliable; this is not a case where the only basis offered for the reliability of an expert's opinion was "the *ipse dixit* of the expert." *General Electric Co. v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997). Rather, Hurley explained his methodology, described specific prior instances in which he applied his methodology, and testified to evidence that tended to confirm that his methodology produced reliable results in those prior applications. This evidence of prior reliable results could be seen, in the language of *Daubert*/ *Schafersman*, as evidence that Hurley's methodology had been tested. As one court has explained, "[t]he reliability of experience-based expertise is often proven by its success." *State v. Warner*, 430 S.C. 76, 88, 842 S.E.2d 361, 367 (S.C. App. 2020).

Prior to concluding our analysis on this assignment of error, we address one final issue. On appeal, Gleaton briefly mentions the testimony of the Verizon records analyst and points out there was no evidence that Verizon confirmed the accuracy of the RTT data used here. Initially, we note that it is not clear that Gleaton preserved an argument based on the testimony of the Verizon records analyst. Gleaton did object to Hurley's testimony, but on the basis of his prior motion in limine, which made no challenge to the fact that the accuracy of the underlying RTT data had not been confirmed by Verizon.

In any event, we are not persuaded that the district court abused its discretion even if the testimony of the Verizon records analyst is considered. Although the Verizon records analyst was apparently not willing to vouch for the accuracy of the RTT data, we do not believe the district court was precluded from finding that Hurley's opinions in this case were sufficiently reliable to be admitted. We certainly recognize that the reliability of Hurley's methodology depends upon the accuracy of the underlying RTT data. But the district court had significant evidence that the RTT data was accurate in prior investigations in which Hurley's methodology had been employed. The district court also had significant evidence that the RTT data was accurate in this case: Many of Hurley's opinions based on RTT data were corroborated by other evidence. Hurley's opinions as to the various locations of Christiansen's phone throughout the early morning hours of July 24, 2020, were corroborated by the testimony of her friends. Hurley's opinion that Gleaton's phone was within an arc that included Christiansen's home that morning was corroborated by the testimony of Christiansen's next-door neighbor and Gleaton's admissions to law enforcement. And Hurley's opinion that, after the time of the shooting, Gleaton's phone traversed through Jackson and returned to Sioux City was corroborated by testimony that the vehicle Gleaton was

driving was eventually found in Jackson and that Gleaton himself was eventually located and arrested in Sioux City.

Given the evidence tending to show that Hurley's methodology produced reliable results in prior applications, and the evidence tending to show the accuracy of the underlying RTT data in this case, we cannot say that the district court abused its discretion in admitting Hurley's testimony.

## 2. Prosecutorial Misconduct

Gleaton next assigns that the district court erred by overruling objections he made to two statements of the prosecutor during closing arguments.

### (a) Additional Background

Gleaton objected to two separate statements made by the prosecutor during closing arguments. The first occurred near the very end of the prosecutor's initial closing argument. At that time, the following exchange occurred:

[Prosecutor:] You are here and you've spent seven days because — because we as a group, whether you call it society or the State, whatever, are in a social contract. And we have rules in that social contract. The rules are you don't kill folk. You particularly don't kill folk in this manner. If you do, we have higher — you know, we drag in people to see if you broke that contract.

[Defense counsel:] Judge, I'm going to object on this closing about social contract. This is kind of the golden rule thing. I think it's improper for the State to be kind of playing to those emotional issues. I think that's improper. I would ask to strike and tell the jury to disregard.

[Prosecutor:] I'm explaining the basis of law.

THE COURT: I understand. I'll overrule. You can continue.

[Prosecutor:] That is the basis of law. And the argument for the basis of law is a social contract, who breaks

it and who doesn't. Everybody, it's not just the family or the State or the defendant. Just verdicts are set up for everybody.

Defense counsel made no additional objections to these remarks, nor moved for a mistrial.

Defense counsel then made closing argument. While arguing that there was reasonable doubt as to whether Gleaton shot Christiansen, counsel asked the jury to consider the testimony of first responders that Christiansen failed to identify Gleaton as the shooter when given the opportunity. Defense counsel stated:

[Christiansen's] in that ambulance and she's conscious, understanding what's going on and she's asked this question and she says, "I don't know." "Do you know who shot you?" "No." She would know who . . . Gleaton was. If he's the one that shot her, she would be saying it was [Gleaton].

During the prosecutor's rebuttal argument, Gleaton again objected to statements of the prosecutor. The objection was made in the following exchange:

[Prosecutor:] A big point made was those two rescue squad people. Well, one of them, the younger fellow, "Tell my son I love him. I know I'm dying." She knew she was dying. Every beat of her heart put more blood against the heart in the body. "I can't breathe." And in pain.

. . . .

She was dying. Dying hard. Dying painfully. She had one thing in her life she would have liked to have clinged on to, even if she was dying, and that was her son. It's just as likely, as [defense counsel] —

[Defense counsel:] Judge, I'm going to object at this point. This is tugging at the heartstrings of the jury and appealing to their emotions. I think it's improper and I would object.

[Prosecutor:] I'm explaining her last words and why she would not identify the person, . . . Gleaton, as the killer.

THE COURT: The objection is overruled. You may continue.

[Prosecutor:] As she was dying and as she was dying hard and as she was thinking of her son, maybe she was trying to protect her son. Maybe she recalls that door that had been broken down. Maybe she recalled who she loved and maybe she wanted to get her last words out. Maybe, whatever thought process she had, she wanted to die with some nobility and some sense of purpose.

The older rescue squad fellow who testified, . . . "Yeah, I've been through this a lot. I've seen this. We tried. Dying people have other things on their mind." Nothing can be taken for [Christiansen's] refusal to identify . . . Gleaton as her killer.

Gleaton again raised no further objection concerning the above remarks, nor moved for a mistrial.

### (b) Standard of Review

The parties disagree as to whether Gleaton preserved for appeal his argument that the prosecutor committed misconduct during his closing argument. The State argues that because Gleaton did not move for a mistrial based on the prosecutor's statements, he has waived any error resulting from the comments. The State has cited a line of cases from this court recognizing such a proposition. See, e.g., *State v. Stricklin*, 290 Neb. 542, 563, 861 N.W.2d 367, 388 (2015) ("[a] party who fails to make a timely motion for mistrial based on prosecutorial misconduct waives the right to assert on appeal that the court erred in not declaring a mistrial due to such prosecutorial misconduct").

Before addressing Gleaton's response, we briefly digress to note that while there is ample authority holding that our review is limited when a defendant fails to move for a mistrial

based on alleged prosecutorial misconduct, our language in cases recognizing that principle may have been somewhat imprecise to the extent we said that a defendant *waives* the right to claim prosecutorial misconduct on appeal by failing to move for a mistrial. As we have recently observed, the failure to timely assert an objection technically amounts to a forfeiture rather than a true waiver, and when a forfeiture occurs, an appellate court still has the discretion to notice plain error. See *State v. Horne*, 315 Neb. 766, 1 N.W.3d 457 (2024). Despite our references to waiver, we have actually treated a defendant's failure to move for a mistrial on the basis of alleged prosecutorial misconduct more like a forfeiture by conducting a plain error review in such circumstances. See, e.g., *State v. Price*, 306 Neb. 38, 944 N.W.2d 279 (2020); *State v. Mrza*, 302 Neb. 931, 926 N.W.2d 79 (2019).

Returning to the parties' arguments, Gleaton takes issue with our cases holding that appellate review is limited if a defendant fails to move for a mistrial based on alleged prosecutorial misconduct. He asks us to reconsider that line of cases and relies heavily on the work of a commentator. See John P. Lenich, Nebraska Civil Procedure § 31:11 (2023). That commentator argues that if, as here, defense counsel contemporaneously objects to allegedly improper statements of the prosecutor and the objection is overruled, counsel should not also have to move for a mistrial to preserve the issue for appellate review. See *id*. While Gleaton argues that his counsel's objections should be sufficient to preserve his claims of prosecutorial misconduct for appellate review, he concedes that if we treat the issue as preserved, any review should be for abuse of discretion.

Ultimately, we find this is not an appropriate case to reconsider our precedent requiring a motion for mistrial to preserve the issue of prosecutorial misconduct for full appellate review. We reach this conclusion because, even assuming the issue is preserved for full appellate review, the district court

did not abuse its discretion in overruling Gleaton's objections. We explain why below.

### (c) Analysis

[6-9] We have said that prosecutorial misconduct "encompasses conduct that violates legal or ethical standards for various contexts because the conduct will or may undermine a defendant's right to a fair trial." *Price*, 306 Neb. at 54, 944 N.W.2d at 292. Prosecutors are charged with the duty to conduct criminal trials in such a manner that the accused may have a fair and impartial trial, and prosecutors are not to inflame the prejudices or excite the passions of the jury against the accused. *Id.* A prosecutor's conduct that does not mislead and unduly influence the jury does not constitute misconduct. *Id.* In assessing allegations of prosecutorial misconduct in closing arguments, a court first determines whether the prosecutor's remarks were improper. *Id*. If the remarks are found to be improper, it is then necessary to determine whether the improper remarks had a prejudicial effect on the defendant's right to a fair trial. See *id.*

We first apply these standards to the prosecutor's remarks near the conclusion of his initial closing argument, where he made reference to a "social contract." Gleaton argues that these remarks "appeal[ed] to societal obligation" and improperly urged the jury to consider the message its verdict would send to the community. Brief for appellant at 25. We disagree with Gleaton's characterization of the prosecutor's remarks. At no time did the prosecutor suggest that the jury had a societal obligation to reach a particular verdict or should consider the impact its verdict would have on the wider community. The prosecutor did make reference to a "social contract," but only in the context of an assertion that murder is a crime and that juries are called to determine whether that crime was committed. Such an innocuous statement would not, in our view, mislead, unduly influence, or inflame the prejudices of the jury against Gleaton. We disagree with Gleaton that these remarks were improper.

As for the prosecutor's remarks in his rebuttal closing argument, we find that they also were not improper. Gleaton argues that the prosecutor appealed to passion and prejudice by describing Christiansen's death and referring to her son. Again, however, the remarks must be viewed in context. Gleaton's counsel had just argued that there was reasonable doubt as to whether Gleaton shot Christiansen, because when Christiansen was asked to identify the shooter, she said she did not know. In response, the prosecutor was entitled to make his own argument based on the evidence as to why that did not establish reasonable doubt. See *State v. Dubray*, 289 Neb. 208, 227, 854 N.W.2d 584, 604 (2014) ("[w]hen a prosecutor's comments rest on reasonably drawn inferences from the evidence, he or she is permitted to present a spirited summation that a defense theory is illogical or unsupported by the evidence"). The prosecutor argued that the fact that Christiansen did not identify the shooter was inconsequential because she was dying and perhaps thinking only of her son. That was a permissible inference from the evidence as there was testimony from the first responders that it is common for individuals in shock to fail to give direct answers to questions, as well as evidence that Christiansen was repeatedly stating at that time, "Tell my son I love him." The prosecutor's summation on this point was indeed spirited, but our law permits as much. See *id.*

### 3. PSR

Gleaton next argues that the district court erred by not striking certain material from the PSR.

### (a) Additional Background

Prior to sentencing, Gleaton filed a motion in which he asked the district court to direct the probation office not to include within the PSR (1) victim impact letters from anyone other than victims as defined under Neb. Rev. Stat. § 29-119(2)(b) (Supp. 2019) and (2) letters that include

characterizations and opinions about the crimes, Gleaton, and the appropriate sentences. The district court overruled Gleaton's motion.

After the PSR was prepared, Gleaton filed a second motion requesting the district court to strike from the PSR specific letters submitted by individuals he contended were not allowed to submit such letters, including siblings, aunts, uncles, and a friend of Christiansen. Gleaton also asked the district court to redact from the PSR what he contended were improper characterizations and opinions about the crimes, Gleaton, and the appropriate sentences. At the sentencing hearing, the district court heard argument on Gleaton's second motion, overruled the motion, and stated the court would "disregard any information contained in those letters that are inappropriate characterizations and opinions about [Gleaton], the crime[s], or the appropriate sentence[s]."

### (b) Standard of Review

[10] Absent an abuse of discretion, an appellate court will not disturb a trial court's rulings as to the source and type of evidence and information that may be used in determining the kind and extent of punishment to be imposed. *State v. Lara*, 315 Neb. 856, 2 N.W.3d 1 (2024).

### (c) Analysis

Gleaton argues on appeal that the district court erred by not striking from the PSR the victim impact letters submitted by persons not specifically identified as victims under the Nebraska Crime Victim's Reparations Act. See § 29-119(2) and Neb. Rev. Stat. § 81-1848 (Cum. Supp. 2022). He also argues that the district court should have removed statements within victim impact letters that he contends were characterizations and opinions about the crimes, Gleaton, and the appropriate sentences.

Our precedent and the district court's response to Gleaton's motions on this issue pose substantial barriers to Gleaton's arguments. First, we have, on numerous occasions, rejected

arguments that the Nebraska Crime Victim's Reparations Act prohibits a sentencing court from receiving information from individuals other than those specifically identified as victims in that statute. See, e.g., *State v. Thieszen*, 300 Neb. 112, 912 N.W.2d 696 (2018); *State v. Galindo*, 278 Neb. 599, 774 N.W.2d 190 (2009). Second, while we have held in some *capital cases* that victim family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence may not be received in evidence, see, e.g., *State v. Garcia*, 315 Neb. 74, 994 N.W.2d 610 (2023); *State v. Vela*, 279 Neb. 94, 777 N.W.2d 266 (2010), Gleaton does not point to any authority suggesting that limitation applies to a noncapital case like this one. Finally, even if the district court were precluded from considering characterizations and opinions about the crime, the defendant, and the appropriate sentence, the district court expressly stated that it would not consider "inappropriate characterizations and opinions about [Gleaton], the crime[s], or the appropriate sentence[s]." We have held in a capital case that the Eighth Amendment is not violated if a sentencing panel does not consider impermissible victim impact statements. See *State v. Bjorklund*, 258 Neb. 432, 604 N.W.2d 169 (2000), *abrogated on other grounds, State v. Mata*, 275 Neb. 1, 745 N.W.2d 229 (2008).

In the face of the foregoing, Gleaton has crafted a novel argument. He claims that he is not objecting to the district court's consideration of the victim impact material at issue, but the future possible consideration of the material by others. He observes that by statute, the PSR will be transmitted to the Department of Correctional Services and, in addition, may be requested by the Board of Parole. See Neb. Rev. Stat. § 29-2261(8) (Cum. Supp. 2020). He contends that because the district court did not remove the material to which he objected, correctional and parole officials will now have access to material they should not have. As a remedy on this issue, he asserts that we should remand the cause to the district court, not to reverse or vacate his convictions or

sentences, but solely to direct the district court to strike from the PSR the material he has challenged.

We are not persuaded by Gleaton's argument. Regardless of what entities may ultimately receive the PSR from this case, Gleaton has not shown that the district court was obligated to strike any material from the PSR. The district court had discretion to accept victim impact letters from persons other than those identified as victims by statute, and we are aware of no authority that required the district court to strike from the PSR any characterizations and opinions about Gleaton's crimes, Gleaton, or the appropriate sentences. Gleaton has also failed to direct us to authority that would prohibit correctional or parole officials from considering the information to which he objects. But, more importantly, to the extent any entity might, at some unspecified point in the future, unlawfully rely on material in the PSR to Gleaton's detriment, that issue is not before us today. See *Williams v. Frakes*, 315 Neb. 379, 385, 996 N.W.2d 498, 503 (2023) (observing that "fundamental principle" of ripeness doctrine is that "courts should avoid entangling themselves, through premature adjudication, in abstract disagreements based on contingent future events that may not occur at all or may not occur as anticipated").

### 4. JUDICIAL MISCONDUCT

Finally, Gleaton assigns that the district court committed judicial misconduct at sentencing. Gleaton argues that the district court judge asked him inappropriate questions during sentencing and that as a result, his sentences should be vacated and the cause should be remanded for resentencing in front of a different judge.

### (a) Additional Background

During the sentencing hearing, the district court engaged in a colloquy with Gleaton. In that exchange, the district court asked Gleaton about his background, his use of marijuana, prior convictions of domestic assault, and possible gang affiliation. Gleaton admitted that he was not working at the time

of Christiansen's death, that he used marijuana regularly, and that he had previously been convicted of domestic assault, but he denied membership in any gangs.

The district court then asked Gleaton, "[W]hy did you shoot . . . Christiansen?" Gleaton's trial counsel objected and advised Gleaton not to answer. The district court then asked Gleaton, "Do you wish to answer my question, sir?" Gleaton declined.

Later at the sentencing hearing, the State called to testify an investigator who interviewed Gleaton. The prosecutor stated that the investigator would provide testimony relevant to the district court's questions about Gleaton's membership in a gang. The prosecutor asked the investigator whether Gleaton made statements to him about gang membership or identified other gang members, but Gleaton's counsel objected on foundation grounds, and the objections were sustained.

### (b) Standard of Review

[11] A sentence imposed within the statutory limits will not be disturbed on appeal in the absence of an abuse of discretion by the trial court. *State v. Miller*, 312 Neb. 17, 978 N.W.2d 19 (2022).

### (c) Analysis

Gleaton argues that based on the exchange recounted above, a reasonable person would question the district judge's impartiality. He argues that the district judge demonstrated bias in multiple ways. First, he contends that the district judge's questions about his lack of employment, drug use, and prior convictions evince partiality; he asserts that this information was available in the PSR and speculates that the district court asked these questions in open court only to satisfy those present who were supportive of Christiansen. Second, he contends that the district judge also showed bias by asking Gleaton why he shot Christiansen. On this point, Gleaton claims that the district judge asked him a question he had a Fifth Amendment right not to answer. Finally, Gleaton

contends that the district court's questions about gang membership showed bias against Gleaton and allowed the State to introduce evidence regarding gang membership.

In support of his argument that the district court demonstrated bias, Gleaton relies on *State v. Pattno*, 254 Neb. 733, 579 N.W.2d 503 (1998). In that case, during the sentencing of a defendant convicted of sexual assault of a child, the district court read a biblical passage. This court vacated the sentence and remanded the cause for resentencing before a different judge.

We agree that *Pattno, supra*, sets forth the governing standards to assess Gleaton's argument, but we disagree that application of those standards in this case requires that Gleaton's sentences be vacated. In *Pattno*, we reiterated prior holdings that a defendant seeking to disqualify a judge on the basis of bias or prejudice bears the heavy burden of overcoming the presumption of judicial impartiality. We held, however, that "[i]f a judge's comments during sentencing could cause a reasonable person to question the impartiality of the judge, then the defendant has been deprived of due process and the judge has abused his or her discretion." *Id.* at 743, 579 N.W.2d at 509.

We find that the comments of the district court judge here could not cause a reasonable person to question the judge's impartiality. Although answers to some of the questions posed to Gleaton may have been available in the PSR, we do not believe a reasonable person would question the district judge's partiality because of the questions he asked regarding Gleaton's background. Neither do we find a reasonable basis for believing the district judge was biased against Gleaton because he asked Gleaton why he shot Christiansen. Gleaton may have had a Fifth Amendment right not to answer the district judge's question, and at his counsel's advice, he did not answer it. That said, we do not believe the district judge demonstrated a basis to question his impartiality by giving Gleaton an opportunity to provide an explanation for the crime

of which he stood convicted by a jury prior to sentencing. Finally, we do not believe the district court's question regarding gang membership would allow a reasonable person to conclude that the district court was biased. In *Pattno, supra*, it was determined that the district court's recitation of a biblical passage interjected the trial judge's personal views into the sentencing proceeding. Here, we see nothing similar. Rather, the district court asked Gleaton various questions, the answers of which were potentially relevant to the appropriate sentences to be imposed.

## 5. PLAIN ERROR

In addition to Gleaton's assignments of error, the State argues that the district court committed plain error when it applied 413 days' credit for time served to Gleaton's life sentence, instead of applying the credit to the nonlife sentences consecutive to Gleaton's life sentence. We agree with the State.

[12] A defendant is not entitled to credit for time served against a life sentence. See *State v. Ely*, 287 Neb. 147, 841 N.W.2d 216 (2014). When, however, a defendant receives a sentence consecutive to the life sentence that has maximum and minimum terms, the defendant is entitled to receive credit for time served against the consecutive sentence. *Id.*

The district court's application of 413 days' credit for time served to Gleaton's life sentence was plain error. We therefore modify Gleaton's sentences by ordering that Gleaton receive 413 days' credit for time served against the aggregate of the minimum and the aggregate of the maximum sentences of imprisonment for his nonlife sentences. See *State v. Custer*, 292 Neb. 88, 871 N.W.2d 243 (2015).

## IV. CONCLUSION

For the reasons explained above, we affirm Gleaton's convictions and affirm his sentences as modified to correct the district court's award of credit for time served against his life sentence.

AFFIRMED AS MODIFIED.