Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
11/25/2025 09:11 AM CST

State of Nebraska, appellee, v. Walter M.
Alexander, appellant.

___ N.W.3d ___

Filed November 25, 2025.    No. A-24-829.

1. **Jury Instructions: Appeal and Error.** Whether jury instructions are correct is a question of law, which an appellate court resolves independently of the lower court's decision.
2. **Criminal Law: Motions for New Trial: Appeal and Error.** In a criminal case, a motion for new trial is addressed to the discretion of the trial court, and unless an abuse of discretion is shown, the trial court's determination will not be disturbed.
3. **Expert Witnesses: Appeal and Error.** The standard for reviewing the admissibility of expert testimony is abuse of discretion.
4. **Judgments: Expert Witnesses: Words and Phrases.** An abuse of discretion in the trial court's determination under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001), occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.
5. **Criminal Law: Juries: Verdicts.** Where a single offense may be committed in a number of different ways and there is evidence to support each of the ways, the jury need only be unanimous in its conclusion that the defendant violated the law by committing the act.
6. ____: ____: ____. A jury need not be unanimous in its conclusion as to which of several consistent theories it believes resulted in the violation of law.
7. ____: ____: ____. A jury need not be unanimous as to the theory upon which it relies to convict a defendant, as long as each juror is convinced beyond a reasonable doubt that the defendant committed the crime.

8. **Homicide: Jury Instructions.** A trial court is required to give an instruction where there is any evidence which could be believed by the trier of fact that the defendant committed manslaughter and not murder.

9. **Jury Instructions.** A trial court is not obligated to instruct the jury on matters which are not supported by evidence in the record.

10. **Jury Instructions: Pleadings: Evidence.** Whether requested to do so or not, a trial court has the duty to instruct the jury on issues presented by the pleadings and the evidence, and it must, on its own motion, correctly instruct on the law.

11. **Homicide: Words and Phrases.** A sudden quarrel is a legally recognized and sufficient provocation which causes a reasonable person to lose normal self-control.

12. \_\_\_\_: \_\_\_\_. A sudden quarrel does not necessarily mean an exchange of angry words or an altercation contemporaneous with an unlawful killing and does not require a physical struggle or other combative corporal contact between the defendant and the victim.

13. **Homicide: Intent.** It is not the provocation alone that reduces the grade of the crime, but, rather, the sudden happening or occurrence of the provocation so as to render the mind incapable of reflection and obscure the reason so that the elements necessary to constitute murder are absent.

14. \_\_\_\_: \_\_\_\_. In determining whether a killing constitutes murder or sudden quarrel manslaughter, the question is whether there existed reasonable and adequate provocation to excite one's passion and obscure and disturb one's power of reasoning to the extent that one acted rashly and from passion, without due deliberation and reflection, rather than from judgment. The test is an objective one.

15. **Convictions: Weapons: Intent.** Under Neb. Rev. Stat. § 28-1205 (Reissue 2016), when the underlying felony for the use of a weapon charge is an unintentional crime, the defendant cannot be convicted of use of a weapon to commit a felony.

16. \_\_\_\_: \_\_\_\_: \_\_\_\_. An unintentional crime cannot serve as the predicate felony for a weapons charge under Neb. Rev. Stat. § 28-1205 (Reissue 2016).

17. **Homicide: Weapons: Intent.** Sudden quarrel manslaughter is an intentional killing, and thus, is a proper predicate for the crime of use of a firearm to commit a felony.

18. \_\_\_\_: \_\_\_\_: \_\_\_\_. Involuntary manslaughter can also serve as the predicate offense for use of a firearm to commit a felony conviction if the unlawful act is an intentional crime.

19. **Criminal Law: Intent: Words and Phrases.** A person can be guilty of reckless assault when he or she acted recklessly but did not intend

serious bodily injury to occur. Thus, the state of mind to convict for reckless assault does not rise to the level of "knowing" or "intentional."

20. **Convictions: Weapons: Intent.** A reckless assault is an unintentional crime and cannot be used as a predicate offense for the use of a firearm conviction.

21. **Jury Instructions: New Trial.** In order to find that a trial court's error in the jury instructions warrants a new trial, it must be shown that a substantial right of the defendant was adversely affected and that the defendant was prejudiced thereby.

22. **Criminal Law: Trial: Juries: Appeal and Error.** In a criminal case tried to a jury, harmless error exists when there is some incorrect conduct by the trial court which, on review of the entire record, did not materially influence the jury in reaching a verdict adverse to a substantial right of the defendant.

23. **Criminal Law: Evidence: New Trial: Appeal and Error.** Upon finding error in a criminal trial, the reviewing court must determine whether all evidence admitted by the trial court was sufficient to sustain the conviction before remanding for a new trial.

24. **Double Jeopardy: Evidence: New Trial: Appeal and Error.** The Double Jeopardy Clause does not forbid a retrial so long as the sum of the evidence admitted by a trial court would have been sufficient to sustain a guilty verdict.

25. **Evidence: New Trial: Appeal and Error.** When considering the sufficiency of the evidence in determining whether to remand for a new trial or to dismiss, an appellate court must consider all the evidence admitted by the trial court irrespective of the correctness of that admission.

26. **Jury Instructions: Evidence: New Trial.** If the trial court fails to adequately instruct the jury but the reviewing court finds sufficient evidence to convict, the cause may be remanded to the trial court for a new trial.

27. **Rules of Evidence: Jurors: Testimony.** Neb. Rev. Stat. § 27-606 (Reissue 2016) prohibits a juror from testifying about any matter or statement which occurred during the jury's deliberation, with two exceptions: whether extraneous prejudicial information was brought to the jury's attention and whether any outside influence was brought to bear upon any member of the jury.

28. **Rules of Evidence: Jurors: Affidavits.** Neb. Rev. Stat. § 27-606(2) (Reissue 2016) does not allow a juror's affidavit to impeach a verdict on the basis of jury motives, methods, misunderstanding, thought processes, or discussions during deliberations.

29. **Trial: Evidence: Proof: Appeal and Error.** Because a ruling on a motion in limine is not a final ruling on the admissibility of evidence

and does not present a question for appellate review, a question concerning the admissibility of evidence which is the subject of a motion in limine is raised and preserved for appellate review by an appropriate objection or offer of proof during trial.

30. **Rules of Evidence: Expert Witnesses.** The admission of expert testimony under Neb. Rev. Stat. § 27-702 (Reissue 2016) is governed by a legal framework initially set forth by the U.S. Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and later adopted by the Nebraska Supreme Court in *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001).

31. ____: ____. There are four preliminary questions that must be answered in order to determine whether an expert's testimony is admissible: (1) whether the witness qualifies as an expert pursuant to Neb. Rev. Stat. § 27-702 (Reissue 2016); (2) whether the expert's testimony is relevant; (3) whether the expert's testimony will assist the trier of fact to understand the evidence or determine a controverted factual issue; and (4) whether the expert's testimony, even though relevant and admissible, should be excluded in light of Neb. Rev. Stat. § 27-403 (Reissue 2016) because its probative value is substantially outweighed by the danger of unfair prejudice or other considerations.

32. **Expert Witnesses.** Expert testimony should not be received if it appears the witness is not in possession of such facts as will enable him or her to express a reasonably accurate conclusion, as distinguished from mere guess or conjecture.

33. ____. Even if an expert possesses specialized knowledge, his or her testimony is properly excluded if the record does not support a finding that the expert had a sufficient foundation for his or her opinion.

34. **Courts: Expert Witnesses.** Under the *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001), framework, the trial court acts as a gatekeeper to ensure the evidentiary relevance and reliability of an expert's opinion.

35. **Trial: Expert Witnesses: Intent.** The purpose of this gatekeeping function is to ensure that the courtroom door remains closed to "junk science" that might unduly influence the jury, while admitting reliable expert testimony that will assist the trier of fact.

36. **Trial: Expert Witnesses: Proof.** The *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001), standards require proof of the scientific validity of principles and methodology utilized by an expert in arriving at the opinion.

37. **Courts: Expert Witnesses.** Once the reasoning or methodology of an expert's opinion has been found to be reliable, the trial court must determine whether the expert's reasoning or methodology was properly applied to the facts of the case.

38. **Trial: Expert Witnesses: Proof.** The proponent of expert testimony bears the burden of establishing its reliability under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001).

39. **Trial: Expert Witnesses.** A trial court can consider several nonexclusive factors in determining the reliability of an expert's opinion: (1) whether a theory or technique can be (and has been) tested; (2) whether it has been subjected to peer review and publication; (3) whether, in respect to a particular technique, there is a high known or potential rate of error; (4) whether there are standards controlling the technique's operation; and (5) whether the theory or technique enjoys general acceptance within a relevant scientific community.

40. **Courts: Expert Witnesses.** A trial court may consider one or more factors when doing so will help determine testimony's reliability, but the test of reliability is flexible and the list of specific factors neither necessarily nor exclusively applies to all experts or in every case.

Appeal from the District Court for Sarpy County: GEORGE A. THOMPSON, Judge. Affirmed in part, and in part reversed and remanded for a new trial.

Todd A. West, Sarpy County Public Defender, and John P. Hascall for appellant.

Michael T. Hilgers, Attorney General, and Erin E. Tangeman for appellee.

PIRTLE, BISHOP, and WELCH, Judges.

PIRTLE, Judge.

## INTRODUCTION

Following a jury trial, Walter M. Alexander was convicted in the district court for Sarpy County of manslaughter, terroristic threats, two counts of use of a weapon (firearm) to commit a felony, operating a motor vehicle to avoid arrest,

and obstructing a peace officer. He raises issues with the jury instructions and verdict form, the admissibility of affidavits in support of his motion for new trial, and the State's motion in limine regarding the admissibility of expert testimony. Because the jury instruction for use of a weapon to commit a felony (manslaughter) did not require a finding that the underlying felony must be an intentional crime, we reverse the conviction for that charge and remand the cause for a new trial on such charge. The convictions for the remaining charges are affirmed.

## BACKGROUND

### Charges

On August 26, 2023, Brittany Alexander was shot in the chest at her home in Papillion, Nebraska, and died. The State filed a second amended information charging Walter with eight counts related to the shooting and the events that followed, which counts included: second degree murder, terroristic threats, two counts of use of a weapon (firearm) to commit a felony, operating a motor vehicle to avoid arrest, obstructing a peace officer, leaving the scene of a property damage accident, and refusal to submit to a preliminary breath test. Walter pled not guilty, and a jury trial was scheduled. Prior to trial, Walter entered a no contest plea to the charges of leaving the scene of a property damage accident and refusal to submit to a preliminary breath test.

### State's Motion in Limine

The State filed a motion in limine requesting the court to enter an order prohibiting Walter from calling Larry Barksdale as an expert witness at trial. Walter intended to have Barksdale testify as an expert in bloodstain patterns and crime scene reconstruction and proffer an opinion that a struggle between Brittany and Walter could not be excluded as part of a reasonable explanation of the shooting event.

The State asserted that Barksdale was not an expert under Neb. Rev. Stat. § 27-702 (Reissue 2016) and that his testimony should be precluded under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993) (later adopted by the Nebraska Supreme Court in *Schafersman v. Agland Coop.*, 262 Neb. 215, 631 N.W.2d 862 (2001)) (*Daubert/Schafersman*). The State further asserted that Barksdale's testimony would not assist the trier of fact to understand the evidence or determine a controverted factual issue and was not relevant. Lastly, the State asserted that if Barksdale's testimony were relevant and admissible, it should be excluded because its probative value would be outweighed by the danger of unfair prejudice.

The district court held an evidentiary hearing on the motion. Barksdale testified at the hearing, and his deposition, his report, and other exhibits were received into evidence.

Barksdale is a crime scene reconstructionist and the owner of "LEB Investigations." He testified that he was asked by Walter's counsel to provide an assessment of the crime scene and provide information on contributing factors to explain what took place at the time of the shooting.

Barksdale has a bachelor's degree in criminal justice and a master's degree in political science. He was a forensic science assistant professor at the University of Nebraska for 15 years and had recently retired. He was also a former law enforcement officer and a former instructor at the Nebraska Law Enforcement Training Center. Barksdale had previously held certifications from the International Association for Identification, one of the world's largest forensic organizations, for "crime scene analyst" and "crime scene technician." The certifications expired in 2014 and 2004, respectively. When asked what type of training a crime scene reconstructionist needed regarding bloodstain pattern analysis, Barksdale testified that he did not know, but "in [his] experience to feel competent, [he] attended a 40 hour recognized course."

Barksdale testified that he was asked to answer five questions as part of his investigation, including whether the evidence corroborated a struggle between Brittany and Walter just before Brittany was shot. After his investigation, Barksdale concluded that a struggle between Brittany and Walter could not be excluded as part of a reasonable explanation of the shooting event. His conclusion was partially based on his opinion that the bloodstain pattern on Brittany's hand indicated that she had her hand on the firearm when it was discharged.

In his report, Barksdale stated that based on his initial analysis of the case file information, he believed "the available information was consistent with a close-range gunshot during a struggle" between Brittany and Walter. He also stated in his report that based on digital images of Brittany's hand, there was blood spatter consistent with what occurs when a person has a hand gripping a firearm at the time of discharge.

Barksdale testified that he had seen the type of bloodstain pattern on Brittany's hand in other cases where the person was holding a firearm when it was discharged. He testified this was a common bloodstain pattern and something individuals who study bloodstain pattern analysis look for during an investigation. On cross-examination, he clarified that he had personally only seen this bloodstain pattern two or three times during his 41 years as a law enforcement officer.

Barksdale testified that when reconstructing a crime scene, his analysis is based on physical evidence and a cognitive technique. After Barksdale reaches a conclusion about what happened at the crime scene based on the physical evidence, he moves on to mental exercises referred to as "fallibility" and "falsifiability," where he argues to himself why his conclusion is wrong. He testified that his methodology is a cognitive process and something that cannot be measured. According to Barksdale, forensic reconstructionists use various mental ways to reach their conclusions.

Barksdale testified that he did not know if his methodology was generally accepted in the scientific community

because he had not surveyed everyone in the scientific community. He agreed that "a lot of people don't adhere to [his] methodology."

Barksdale agreed that the known rate of error in the general scientific community for bloodstain pattern analysis is around 10 to 11 percent, but he does not adhere to that error rate. Instead, he gauges a 25-percent error rate based on his research, education, training, and experience. His 25-percent error rate is not generally accepted in the scientific community. On cross-examination, however, he testified that there cannot be a rate of error for his methodology because it is not something that can be measured.

Further, in his deposition, he was asked if there is a known standard rate of error with his methodology, and he replied, "It's not a measurement so there can be no error." He further stated that it is not something that can be measured; it is a cognitive process only.

Barksdale testified that he had spent much time re-creating bloodstain patterns, but that none of that work was peer reviewed to ensure accuracy. He also acknowledged that bloodstain pattern analysis is not an acceptable science "by some opinions" and that there needs to be more research done to develop more error rate information.

Following the evidentiary hearing, the district court entered an order granting the State's motion in limine, thereby prohibiting Barksdale's testimony.

### Jury Trial

In June 2024, a jury trial was held on the remaining six charges. Fourteen witnesses testified for the State and five witnesses testified for the defense, including Walter.

The evidence showed that at the time of the shooting, Brittany and Walter were married but they did not live together. Brittany lived in a house with her and Walter's son, Walter's sister Amber Alexander, and Amber's two children. Walter had his own house. He primarily worked out of state

but would sometimes stay overnight at Brittany's home when he was in Nebraska.

In the days leading up to the shooting, Brittany and Walter had been arguing, which apparently was not uncommon. On August 25, 2023, the day before the shooting, Brittany kicked Walter out of her house in the middle of the night. She also changed the code on the door that was needed to enter the home.

Around 2 p.m. on August 26, 2023, the day of the shooting, Walter was on the phone with his and Brittany's son, and during their conversation, Walter called Brittany numerous offensive and derogatory names. Walter later tried to call Brittany three times between 3:38 p.m. and 3:55 p.m., but Brittany did not answer. He then texted her at 3:56 p.m. about not answering her phone. She responded in a text, telling Walter not to call her and informing him that she was going to get a different phone and a new phone number that she was not going to share with him. Walter responded, "So it's over," to which Brittany replied, "Yes [W]alter. It is." Walter sent one more text message to Brittany at 4 p.m. and that was the last text between them. Brittany was shot approximately 2 hours 15 minutes later in her bedroom.

At the time Brittany was shot, Amber and her children were home. Amber testified that she got home from work about 5:15 p.m. and that Brittany arrived home shortly after her. The two of them were talking in the living room, and then Amber fell asleep on the couch while watching television. She woke up when she heard Brittany screaming that Walter was there and heard the two of them arguing. Amber testified she got off the couch and was heading toward Brittany's bedroom when she heard Brittany scream that Walter had a gun. She went back to the living room to get her phone and called the 911 emergency dispatch service. The call was placed at 6:13 p.m. After placing the call, Amber went upstairs and gave the phone to her daughter. Amber told her daughter to

stay on the phone with the 911 operator while she went back downstairs where Brittany's bedroom was located.

Amber testified that when she went back to Brittany's bedroom, Brittany and Walter were both standing in the room and Walter was holding a gun in his right hand, but was not pointing it at Brittany. Brittany and Walter were both yelling at each other. Amber testified that she told Walter the police were on their way and asked him to give her the gun, but he refused. Brittany then tried to grab the gun from Walter. Amber testified that when the struggle for the gun began, she left the room to protect herself. After she left the room, she heard a gunshot. Walter then walked out of the bedroom and left the house. Amber went into the bedroom, and Brittany said Walter shot her. Brittany then fell to the floor.

Dispatch advised police officers about what type of vehicle Walter was driving. Shortly thereafter, a police officer spotted the vehicle, activated his cruiser's lights and sirens, and attempted to initiate a traffic stop. Walter refused to stop, and a pursuit ensued. The pursuit ended when Walter crashed his vehicle into a median. Walter was placed under arrest. His vehicle was processed after his arrest, and a firearm was located inside.

Officer Eric Christiansen was one of the first officers on the scene after the shooting. He talked to Amber, and his body camera recorded their conversation. Christiansen asked Amber what happened, and she stated that Walter came into the house but she did not know how he got in. She said Brittany and Walter were arguing and "he shot her." When Christiansen asked Amber if she saw Walter shoot Brittany, Amber said he had the gun and she "didn't see it exactly." She stated that she called 911 when she heard Walter fire shots "in the air or somewhere." Brittany was still screaming, and she and Walter were arguing. Amber told Christiansen that Brittany then tried to grab the gun and that Amber ran out of the bedroom because she did not want to get shot because they were fighting for the gun.

Amber then further explained to Christiansen the events leading up to Brittany's getting shot. She stated that prior to the shooting, she had dozed off on the couch after coming home from work. She woke up when she heard Brittany screaming Walter's name and heard them fighting. She stated that Walter was not supposed to be in the house. She went to the bedroom, and Brittany said Walter had a gun. Amber begged Walter to put the gun down, but he just kept yelling. Amber told Christiansen she tried to reason with Walter and told him that he was ruining their family. Walter responded that Brittany was the one ruining the family. Amber then went back to the living room to get her phone to call 911. She heard a gunshot and believed that Walter shot the gun in the air. After she called 911, Amber went back to the bedroom and told Walter that the police were on their way. She pleaded with him to put the gun down and told him her children were in the house. She then heard the gun go off and left the room while Brittany was still fighting with him. She then heard Brittany say, "He shot me," and Brittany came to the doorway of the bedroom toward Amber. Walter then left the house, and Amber opened the door so law enforcement could get inside.

At the residence, law enforcement located a fired cartridge case on the bed and an unfired cartridge located on a rug on the bedroom floor. Another fired bullet, which caused numerous wall defects, was located inside a box in the kitchen pantry.

When Walter testified, he claimed that the shooting was accidental. He testified that on the day of the shooting, he went to Brittany's house to retrieve personal items, as well as the gun, and that Brittany let him in the house. At first the two of them were having a conversation while they walked toward Brittany's bedroom so he could retrieve his belongings. When the two of them were in the bedroom, Walter got the gun out of the nightstand. Brittany asked why he was taking the gun, and he told her he was moving to Massachusetts. Brittany became upset and started screaming at him. He testified that they had planned to go to Massachusetts together about a

month later, so she was upset that he was leaving earlier and without her.

Walter testified that Amber came into the bedroom while Brittany was yelling at him and that at that point, Brittany screamed he had a gun. He testified that he thought the reason Brittany screamed that he had a gun when Amber came in was to make him look like a "bad guy." Amber then said she was calling the police. Walter testified that he just wanted to take his belongings and leave but that he did not want to leave the house with a loaded gun. He started to unload the gun, and the cartridge fell onto the floor. He then pulled the trigger so the slide would go back, expecting to hear an empty click. Instead, the gun fired a live round and the bullet went through the wall behind him.

Walter testified that after the gun fired, Amber came back into the bedroom and pleaded for Walter to give her the gun. At that point, Brittany lunged at him and tried to grab the gun. He testified that when Brittany did this, her hands were over his hands as he held the gun and he could not get his finger off the trigger. The gun went off, and Brittany fell to the ground. He testified that he did not intentionally pull the trigger and that he would never hurt Brittany. Walter stated that after Brittany was shot, he "freaked out" and left in his vehicle.

After Walter rested his case, his counsel made the following offer of proof regarding Barksdale's testimony:

> Judge, if . . . Barksdale was permitted to testify in this trial we believe he would have been an expert in bloodstain pattern recognition, and he would have opined that the blood void that was an [sic] Brittany's right hand would be an indicator from him, who's a bloodstain pattern expert, that she would have grabbed onto the firearm or grabbed onto something which caused the blood void and an identifiable bloodstain pattern.
>
> Further, [he] would have opined as a crime scene reconstructionist, that when put everything into together,

which is the gunshot residue, the bloodstain pattern on the hand, the unfired cartridge on the rug, the casing on the bed, the defect in the wall, and the absence of blood in the hand, that she would have — that there would have been a struggle with regards to what occurred in that room. Obviously, a struggle goes in towards a sudden quarrel, manslaughter, instead of an intentional death in this case. So if he was permitted to testify, that's what he would testify to.

At the jury instruction conference, the State objected to instructing the jury on sudden quarrel manslaughter, arguing that there was no evidence before the jury of a sudden quarrel, and Walter agreed. The court found that the sudden quarrel language in the instruction was appropriate based upon the testimony of the parties as well as the audio recording of the 911 phone call.

Walter objected to the court's jury instructions on the elements of use of a firearm to commit a felony on both charges, arguing that the instructions allowed an unintentional act to be the predicate offense for the use charge. Walter offered alternate jury instructions, which the court denied.

Finally, Walter objected to the verdict form regarding manslaughter and terroristic threats, requesting that the jury should be required to delineate which theory of the offenses it relied on in reaching its verdicts. The district court overruled his objection.

The jury found Walter guilty of manslaughter, rather than second degree murder, as well as guilty of terroristic threats, two counts of use of a firearm to commit a felony, operating a motor vehicle to avoid arrest, and obstructing a peace officer.

## MOTION FOR NEW TRIAL

Walter filed a timely motion for new trial. Walter took issue with the judge's rulings regarding the jury instructions for manslaughter and use of a weapon to commit a felony and the jury verdict form.

At a hearing on the motion, Walter offered into evidence affidavits of four jurors and an affidavit of a private investigator who spoke with six of the jurors after deliberations. The affidavits stated how the jurors voted during deliberations regarding the alternate theories of the charged offenses. The State objected to the admission of the affidavits pursuant to Neb. Rev. Stat. § 27-606(2) (Reissue 2016). The district court subsequently entered an order sustaining the State's objection to the exhibits and overruling the motion for new trial.

## Sentences

The district court sentenced Walter to incarceration for 18 to 20 years for manslaughter, 2 to 3 years for terroristic threats, 20 to 30 years for each count of use of a firearm to commit a felony, 1 to 2 years for operating a motor vehicle to avoid arrest, 6 to 12 months for obstructing a peace officer, and 3 to 6 months for leaving the scene of a property damage accident. The sentences were to run consecutively to each other. Walter also received a $100 fine for his refusal to submit to a preliminary breath test conviction, and his operator's license was revoked for 2 years for operating a motor vehicle to avoid arrest.

## ASSIGNMENTS OF ERROR

Walter assigns, renumbered and restated, that the district court erred in (1) failing to delineate the separate prongs of manslaughter and terroristic threats on the verdict form, (2) refusing the parties' request to eliminate a sudden quarrel manslaughter instruction, (3) failing to specify the "unlawful act" when instructing the jury on the elements of involuntary manslaughter, (4) instructing the jury on use of a firearm to commit manslaughter because it allowed an unintentional act to be the predicate offense for the use charge, (5) excluding the affidavits offered into evidence at the hearing on the motion for new trial and overruling his motion, and (6) sustaining the State's motion in limine, precluding Barksdale from providing

his expert opinions in the fields of bloodstain pattern recognition, bullet trajectory, and crime scene reconstruction.

## STANDARD OF REVIEW

[1] Whether jury instructions are correct is a question of law, which an appellate court resolves independently of the lower court's decision. *State v. Haynie*, 317 Neb. 371, 9 N.W.3d 915 (2024).

[2] In a criminal case, a motion for new trial is addressed to the discretion of the trial court, and unless an abuse of discretion is shown, the trial court's determination will not be disturbed. *State v. Allen*, 314 Neb. 663, 992 N.W.2d 712 (2023).

[3,4] The standard for reviewing the admissibility of expert testimony is abuse of discretion. *State v. Gleaton*, 316 Neb. 114, 3 N.W.3d 334 (2024). An abuse of discretion in the trial court's *Daubert*/*Schafersman* determination occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *State v. Gleaton, supra*.

## ANALYSIS

### Verdict Form

Walter first assigns that the district court erred when it failed to delineate the separate prongs of manslaughter and terroristic threats on the verdict form. At the jury instruction conference, Walter objected to the verdict form regarding the manslaughter and terroristic threats charges, requesting that the jury be required to delineate which clause of manslaughter and which clause of terroristic threats it relied on in reaching its verdict. The district court overruled the objection.

A person commits manslaughter "if he or she kills another without malice upon a sudden quarrel or causes the death of another unintentionally while in the commission of an unlawful act." Neb. Rev. Stat. § 28-305 (Reissue 2016).

A person commits terroristic threats "if he or she threatens to commit any crime of violence: (a) [w]ith the intent

to terrorize another; . . . or (c) [i]n reckless disregard of the risk of causing such terror or evacuation." Neb. Rev. Stat. § 28-311.01 (Reissue 2016).

On the verdict form under count 1, the jury was given three options: (1) guilty of second degree murder, (2) guilty of manslaughter, or (3) not guilty. Under count 3 of the verdict form, the jury was given two options: (1) guilty of terroristic threats or (2) not guilty.

The jury instruction regarding manslaughter stated in part:

> The material elements of the crime of Manslaughter as charged in Count 1, are:
>
> 1. That [Walter] killed [Brittany]; and
>
> 2. That [Walter] did so either:
>
> a. Intentionally upon a sudden quarrel; or
>
> b. Unintentionally during the commission of an unlawful act, that is, by [Walter] knowingly, intentionally, or recklessly causing bodily injury to [Brittany]; and
>
> 3. That [Walter] did so on or about August 26th, 2023, in Sarpy County, Nebraska.

The instruction further stated, "You need not be unanimous as to the two categories of Manslaughter as long as you unanimously agree on whether the crime of Manslaughter was committed."

The jury instruction regarding terroristic threats stated in part:

> The elements which the State must prove beyond a reasonable doubt in order to convict [Walter] of Terroristic Threats are:
>
> 1. That [Walter] did threaten to commit any crime of violence:
>
> a. With the intent to terrorize another;
>
> b. . . . or
>
> c. In reckless disregard of the risk of causing such terror or evacuation.
>
> 2. The act took place on or about August 26th, 2023; and
>
> 3. The act took place in Sarpy County, Nebraska.

[5-7] Manslaughter and terroristic threats are both single offenses that may be committed in different ways. See, § 28-305; § 28-311.01(1). Where a single offense may be committed in a number of different ways and there is evidence to support each of the ways, the jury need only be unanimous in its conclusion that the defendant violated the law by committing the act. *State v. Abejide*, 293 Neb. 687, 879 N.W.2d 684 (2016). It need not be unanimous in its conclusion as to which of several consistent theories it believes resulted in the violation. *Id.* Stated differently, a jury need not be unanimous as to the theory upon which it relies to convict a defendant, as long as each juror is convinced beyond a reasonable doubt that the defendant committed the crime. See *id.*

In this case, the jury was instructed on alternate ways Walter could have committed manslaughter and terroristic threats in accordance with the statutes. Because the jury did not have to be unanimous in its conclusion as to which theory it believed, it was not necessary for the verdict form to set out the different theories for manslaughter and terroristic threats so the jury could indicate which theory it found. This assignment of error fails.

## Sudden Quarrel

Walter next assigns that the district court erred when it refused to eliminate the sudden quarrel portion of the manslaughter jury instruction. He argues that the "[i]ntentionally upon a sudden quarrel" language should have been removed because both parties agreed to its removal and there was no evidence of a sudden quarrel.

[8-10] A trial court is required to give an instruction where there is any evidence which could be believed by the trier of fact that the defendant committed manslaughter and not murder. *State v. Smith*, 282 Neb. 720, 806 N.W.2d 383 (2011). But a trial court is not obligated to instruct the jury on matters which are not supported by evidence in the record. *Id.* Similarly, whether requested to do so or not, a trial court has

the duty to instruct the jury on issues presented by the pleadings and the evidence, and it must, on its own motion, correctly instruct on the law. *State v. Brennauer*, 314 Neb. 782, 993 N.W.2d 305 (2023).

[11-14] As previously set out, a person commits manslaughter "if he or she kills another without malice upon a sudden quarrel or causes the death of another unintentionally while in the commission of an unlawful act." § 28-305. A sudden quarrel is a legally recognized and sufficient provocation which causes a reasonable person to lose normal self-control. *State v. Smith*, 284 Neb. 636, 822 N.W.2d 401 (2012). It does not necessarily mean an exchange of angry words or an altercation contemporaneous with an unlawful killing and does not require a physical struggle or other combative corporal contact between the defendant and the victim. *Id.* It is not the provocation alone that reduces the grade of the crime, but, rather, the sudden happening or occurrence of the provocation so as to render the mind incapable of reflection and obscure the reason so that the elements necessary to constitute murder are absent. *Id.* The question is whether there existed reasonable and adequate provocation to excite one's passion and obscure and disturb one's power of reasoning to the extent that one acted rashly and from passion, without due deliberation and reflection, rather than from judgment. *Id.* The test is an objective one. *Id.*

The district court found there was sufficient evidence of a sudden quarrel to include it in the jury instruction. The court made this determination based on the arguing and yelling that can be heard on the 911 call, as well as the testimony of witnesses. There was undisputed evidence that shortly after Walter entered Brittany's home prior to the shooting, the two of them were arguing. According to Amber, Walter accused Brittany of ruining their family. Walter testified that Brittany was upset because he was going to Massachusetts without her and that she yelled to Amber that he had a gun to make him look bad. Further, Amber and Walter both testified

that Brittany tried to grab the gun when it was in Walter's hands. From this evidence, a finder of fact could conclude that Walter was provoked when he and Brittany were arguing and she went for his gun and that as a result of this sudden occurrence, Walter acted rashly and from passion, without due deliberation and reflection, rather than from judgment. See *State v. Smith, supra.* Given that the evidence adduced at trial could support this finding, the district court did not err in instructing the jury on sudden quarrel manslaughter.

### Involuntary Manslaughter

We next address Walter's assignment that the district court erred in failing to specify the "unlawful act" when instructing the jury on the elements of involuntary manslaughter. The instruction regarding the elements of manslaughter, specifically involuntary manslaughter, as previously set forth, included "1. That [Walter] killed [Brittany]; and 2. That [Walter] did so . . . b. [u]nintentionally during the commission of an unlawful act, that is, *by* [*Walter*] *knowingly, intentionally, or recklessly causing bodily injury* to [Brittany] . . . ." (Emphasis supplied.)

Based on the manslaughter instruction, the jury was instructed that the unlawful act for involuntary manslaughter was knowingly, intentionally, or recklessly causing bodily injury to Brittany, which under the statutes is third degree assault. See Neb. Rev. Stat. § 28-310(1)(a) (Reissue 2016) (person commits offense of assault in third degree if he or she intentionally, knowingly, or recklessly causes bodily injury to another person). Although the jury was not instructed that the unlawful act was third degree assault, it was instructed that to find involuntary manslaughter, it had to find the unlawful act of "knowingly, intentionally, or recklessly causing bodily injury." Therefore, an unlawful act was specified in the jury instruction on the elements of involuntary manslaughter. Walter's assignment of error fails.

## USE OF FIREARM TO COMMIT FELONY

Walter next assigns that the district court erred in instructing the jury on use of a firearm to commit manslaughter because it allowed an unintentional act to be the predicate offense for the use charge. Walter had offered a proposed jury instruction to address this deficiency in the court's instruction, but the court declined to incorporate it into the instructions given to the jury. The State agrees that the district court erred.

[15,16] In *State v. Pruett*, 263 Neb. 99, 638 N.W.2d 809 (2002), the court stated that under Nebraska statutory law, when the underlying felony for the use of a weapon charge is an unintentional crime, the defendant cannot be convicted of use of a weapon to commit a felony. See Neb. Rev. Stat. § 28-1205 (Reissue 2016). Stated differently, an unintentional crime cannot serve as the predicate felony for a weapons charge under § 28-1205. See *State v. Pruett, supra.* See, also, *State v. Sepulveda*, 278 Neb. 972, 775 N.W.2d 40 (2009) (when felony which serves as basis of use of weapon charge is unintentional crime, accused cannot be convicted of use of firearm to commit felony).

The *Pruett* court vacated the defendant's sentence for use of a weapon to commit a felony, because the underlying felony—manslaughter for unintentionally causing death while in the commission of reckless assault—was an unintentional crime and the defendant could not be convicted of using a weapon to commit such felony when the felony was an unintentional crime.

Walter was convicted of manslaughter—the underlying felony on the weapons charge—and use of a weapon to commit a felony. For the use of a weapons charge, the district court instructed the jury as follows:

> Count 2 of the Second Amended Information charges [Walter] with Use of a Firearm to Commit a Felony.
>
> The elements which the State must prove beyond a reasonable doubt in order to convict [Walter] of Use of a Firearm to Commit a Felony are:

1. That [Walter] committed the felony of . . . Manslaughter, as set forth in the instruction to Count 1 above; and

2. That [Walter] used a firearm to commit the felony of . . . Manslaughter, as set forth in the instructions to Count 1 above; and

3. That [Walter] did so on or about August 26th, 2023, in Sarpy County, Nebraska[.]

[17,18] As previously noted, the jury was instructed on two different theories of manslaughter: either intentionally upon a sudden quarrel or unintentionally during the commission of an unlawful act. Sudden quarrel manslaughter is an intentional killing, and thus, is a proper predicate for the crime of use of a firearm to commit a felony. Involuntary manslaughter can also serve as the predicate offense for use of a firearm to commit a felony conviction if the unlawful act is an intentional crime. See *State v. Briggs*, 303 Neb. 352, 929 N.W.2d 65 (2019).

[19,20] Here, the unlawful act for the manslaughter charge was "knowingly, intentionally, or recklessly" causing bodily injury to Brittany. Accordingly, the jury could have found that Walter recklessly used a firearm in the commission of the crime of manslaughter. A person can be guilty of reckless assault when he or she acted recklessly but did not intend serious bodily injury to occur. Thus, the state of mind to convict for reckless assault does not rise to the level of "knowing" or "intentional." *State v. Pruett, supra*. A reckless assault is an unintentional crime and cannot be used as a predicate offense for the use of a firearm conviction. See *id.*

The jury instruction for use of a firearm to commit a felony (manslaughter) failed to advise the jury that it could not convict Walter if it found reckless assault to be the unlawful act for involuntary manslaughter. Thus, the district court erred in instructing the jury on use of a firearm to commit a felony (manslaughter).

Walter also argues that the jury instruction for use of a firearm to commit terroristic threats had the same defect. Walter

offered a proposed jury instruction to correct the defect, and, again, the district court refused to give the proposed instruction to the jury.

The jury instruction given stated:

Count 4 of the Second Amended Information charges [Walter] with Use of a Firearm to Commit a Felony.

The elements which the State must prove beyond a reasonable doubt in order to convict [Walter] of Use of a Firearm to Commit a Felony are:

1. That [Walter] committed the felony of Terroristic Threats, as set forth in the instruction to Count 3 above; and

2. That [Walter] used a firearm to commit the felony of Terroristic Threats as set forth in the instructions to Count 3 above; and

3. That [Walter] did so on or about August 26th, 2023, in Sarpy County, Nebraska[.]

Use of a Firearm to Commit a Felony requires the Felony offense to be an intentional felony offense. If you find that Terroristic Threats was committed in a reckless manner, you must not convict for Count 4 Use of a Firearm to Commit a Felony.

As previously set forth, the jury instruction for terroristic threats stated that Walter could be guilty of terroristic threats if he threatened to commit any crime of violence either with the intent to terrorize Brittany or in reckless disregard of the risk of terrorizing Brittany. However, the underlying felony must be intentional before the defendant can be found guilty of use of a weapon to commit a felony. See *State v. Pruett*, 263 Neb. 99, 638 N.W.2d 809 (2002). The jury instruction above told the jury that the felony offense must be intentional to convict on use of a firearm to commit a felony. The instruction further stated that it could not convict Walter for use of a weapon to commit a felony if it found the terroristic threats were committed in a reckless manner. Accordingly, there was

no error in the jury instruction on use of a firearm to commit terroristic threats.

[21,22] In order to find that a trial court's error in the jury instructions warrants a new trial, it must be shown that a substantial right of the defendant was adversely affected and that the defendant was prejudiced thereby. *State v. Rye*, 14 Neb. App, 133, 705 N.W.2d 236 (2005)*.* In a criminal case tried to a jury, harmless error exists when there is some incorrect conduct by the trial court which, on review of the entire record, did not materially influence the jury in reaching a verdict adverse to a substantial right of the defendant. *Id.*

Although the failure to find whether Walter acted intentionally or recklessly did not affect the manslaughter charge, it was not harmless error as to the use of a weapon to commit a felony charge. See *id.* Because the underlying crime for the use of a weapon conviction must be intentional, and no such finding was made, it was error not to instruct the jury that in order to find Walter guilty of the use of a weapon charge, the jury must first find him guilty of intentional predicate offenses, i.e., manslaughter.

[23-25] Upon finding error in a criminal trial, the reviewing court must determine whether all evidence admitted by the trial court was sufficient to sustain the conviction before remanding for a new trial. *State v. Brooks*, 23 Neb. App. 560, 873 N.W.2d 460 (2016). The Double Jeopardy Clause does not forbid a retrial so long as the sum of the evidence admitted by a trial court would have been sufficient to sustain a guilty verdict. *State v. Brooks, supra*. When considering the sufficiency of the evidence in determining whether to remand for a new trial or to dismiss, an appellate court must consider all the evidence admitted by the trial court irrespective of the correctness of that admission. *Id.*

[26] We conclude there was evidence to sustain a conviction on either reckless or intentional manslaughter. Therefore, we reverse Walter's conviction on use of a weapon to commit a felony (manslaughter) and remand the cause for a new trial.

See *State v. Rye, supra* (if trial court fails to adequately instruct jury but reviewing court finds sufficient evidence to convict, cause may be remanded to trial court for new trial).

## Motion for New Trial

Walter assigns the district court erred in excluding affidavits at the hearing on his motion for new trial and subsequently in overruling his motion for new trial. At the hearing, Walter offered into evidence affidavits of four jurors and an affidavit of a private investigator who spoke with six jurors after deliberations. The affidavits set out how the jurors voted regarding the alternate theories of manslaughter and terroristic threats. The district court sustained the State's objection to the affidavits and determined that a new trial was not warranted.

[27,28] The district court's refusal to allow the affidavits into evidence was based on § 27-606, which prohibits a juror from testifying about any matter or statement which occurred during the jury's deliberation, with two exceptions: whether extraneous prejudicial information was brought to the jury's attention and whether any outside influence was brought to bear upon any member of the jury. See *State v. Thomas*, 262 Neb. 985, 637 N.W.2d 632 (2002), *overruled on other grounds, State v. Vann*, 306 Neb. 91, 944 N.W.2d 503 (2020). Section 27-606(2) does not allow a juror's affidavit to impeach a verdict on the basis of jury motives, methods, misunderstanding, thought processes, or discussions during deliberations. *State v. Thomas, supra.*

Here, the affidavits Walter offered into evidence did not allege that extraneous prejudicial information was brought to the jury's attention or that some outside influence was brought to bear upon any member of the jury. Instead, the affidavits discussed how the jurors voted during deliberations regarding the alternate theories of the charged offenses. Thus, the content of the affidavits relate directly to the mental processes of the jurors during deliberations, which is clearly prohibited by § 27-606(2).

We conclude the district court did not err in sustaining the State's objection to the affidavits being entered into evidence at the motion for new trial hearing. Without the affidavits, Walter's arguments as to why the district court erred in denying his motion for new trial are the same arguments he made in the assignments of error relating to the jury instructions and verdict form, which arguments we have already addressed and need not do so again. This assignment of error fails.

### State's Motion in Limine

[29] Walter's final assignment of error is that the district court erred when it granted the State's motion in limine, precluding Barksdale from providing his expert opinions regarding bloodstain pattern recognition, bullet trajectory, and crime scene reconstruction. We first note that although Walter's assignment of error includes the exclusion of Barksdale's opinions regarding bullet trajectory, his offer of proof at trial made no reference to bullet trajectory. Thus, the admissibility of Barksdale's opinion on bullet trajectory is not properly before this court. See *State v. King*, 316 Neb. 991, 7 N.W.3d 884 (2024) (because ruling on motion in limine is not final ruling on admissibility of evidence and does not present question for appellate review, question concerning admissibility of evidence which is subject of motion in limine is raised and preserved for appellate review by appropriate objection or offer of proof during trial). We will address whether the district court abused its discretion in granting the State's motion in limine as to Barksdale's opinions regarding bloodstain pattern recognition and crime scene reconstruction.

[30] Section 27-702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." The admission of expert testimony under § 27-702 is governed by a legal framework initially set

forth by the U.S. Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and later adopted by the Nebraska Supreme Court in *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001). *State v. Gleaton*, 316 Neb. 114, 3 N.W.3d 334 (2024).

[31] There are four preliminary questions that must be answered in order to determine whether an expert's testimony is admissible: (1) whether the witness qualifies as an expert pursuant to § 27-702; (2) whether the expert's testimony is relevant; (3) whether the expert's testimony will assist the trier of fact to understand the evidence or determine a controverted factual issue; and (4) whether the expert's testimony, even though relevant and admissible, should be excluded in light of Neb. Rev. Stat. § 27-403 (Reissue 2016) because its probative value is substantially outweighed by the danger of unfair prejudice or other considerations. See *State v. Woolridge-Jones*, 316 Neb. 500, 5 N.W.3d 426 (2024).

[32,33] In addition to the foregoing, the Nebraska Supreme Court has also recognized that expert testimony should not be received if it appears the witness is not in possession of such facts as will enable him or her to express a reasonably accurate conclusion, as distinguished from mere guess or conjecture. *Id*. Even if an expert possesses specialized knowledge, his or her testimony is properly excluded if the record does not support a finding that the expert had a sufficient foundation for his or her opinion. *Id.*

[34-36] Under the *Daubert*/*Schafersman* framework, the trial court acts as a gatekeeper to ensure the evidentiary relevance and reliability of an expert's opinion. *State v. Gleaton, supra.* The purpose of this gatekeeping function is to ensure that the courtroom door remains closed to "junk science" that might unduly influence the jury, while admitting reliable expert testimony that will assist the trier of fact. *Id*. The *Daubert*/*Schafersman* standards require proof of the scientific

validity of principles and methodology utilized by an expert in arriving at the opinion. *State v. Gleaton, supra*.

[37,38] Once the reasoning or methodology of an expert's opinion has been found to be reliable, the trial court must determine whether the expert's reasoning or methodology was properly applied to the facts of the case. *Id*. The proponent of expert testimony bears the burden of establishing its reliability under *Daubert/Schafersman*. *State v. Gleaton, supra*.

The district court found that Barksdale did not meet the requirements of an expert under § 27-702 and that his reasoning or methodology underlying his testimony was not reliable. Even if we assume, without deciding, that Barksdale meets the requirements of an expert under § 27-702, we agree with the district court that his reasoning or methodology underlying his testimony in this case was not reliable. Stated differently, based on the record before us, Walter failed to meet his burden of establishing the reliability of Barksdale's reasoning and methodology.

[39] A trial court can consider several nonexclusive factors in determining the reliability of an expert's opinion: (1) whether a theory or technique can be (and has been) tested; (2) whether it has been subjected to peer review and publication; (3) whether, in respect to a particular technique, there is a high known or potential rate of error; (4) whether there are standards controlling the technique's operation; and (5) whether the theory or technique enjoys general acceptance within a relevant scientific community. *State v. Gleaton*, 316 Neb. 114, 3 N.W.3d 334 (2024).

[40] A trial court may consider one or more of those factors when doing so will help determine that testimony's reliability, but the test of reliability is flexible and the list of specific factors neither necessarily nor exclusively applies to all experts or in every case. *Id*.

There was much testimony at the hearing regarding Barksdale's knowledge of bloodstain pattern analysis and crime scene reconstruction, but the evidence regarding the reliability

of Barksdale's methodology and techniques was lacking. In addition, there were notable differences between Barksdale's deposition testimony and his courtroom testimony.

Walter failed to demonstrate that Barksdale's theories or techniques could be tested. Barksdale testified at the hearing that his methodology is a cognitive process, or an internal thought process, and is not something that can be measured. It is something that he came up with over the years and cannot be independently duplicated and tested.

Walter also failed to establish that Barksdale's theory has been subjected to peer review and publication or that it is generally accepted within the relevant scientific community. Barksdale testified that he employs a "cognitive" technique in his methodology and that this was a technique he had developed over the years based on his training and experience. He testified that he did not know if his methodology was generally accepted in the scientific community because he had not surveyed everyone in the scientific community. He also testified that "a lot of people don't adhere to [his] methodology." In his deposition, he agreed that his methodology has not been peer reviewed and is not generally accepted in the scientific community.

Barksdale also testified to a higher rate of error for his research than the scientific community uses. He stated that he utilizes a 25-percent rate of error based upon his own research, observations, and experience. He acknowledged that the rate of error generally accepted by the scientific community is between 10 and 11 percent. Barksdale further admitted that his 25-percent rate of error is not generally accepted in the scientific community at large. On cross-examination, however, he testified that there cannot be a rate of error for his methodology because it is not something that can be measured.

Further, in his deposition, Barksdale was asked if there is a known standard rate of error with his methodology, and he replied, "It's not a measurement so there can be no error."

He further stated that it is not something that can be measured; it is a cognitive process only.

Barksdale also testified that he spent much time re-creating bloodstain patterns but admitted that none of that work had been peer reviewed to ensure accuracy. He also acknowledged that bloodstain pattern analysis is not an acceptable science "by some opinions" and that there needs to be more research done to develop more error rate information.

Based on Barksdale's testimony in court, as well as in his deposition, and based on a review of the factors relevant to the admissibility of evidence under *Daubert*/*Schafersman*, we determine the district court did not err in concluding that in this case, Walter failed to meet his burden to show Barksdale's reasoning or methodology was reliable. Consequently, there was no error by the district court in granting the State's motion in limine, which excluded Barksdale's testimony. Walter's final assignment of error fails.

## CONCLUSION

The district court failed to instruct the jury that in order to find Walter guilty of the crime of use of a weapon to commit a felony (manslaughter), the underlying felony (manslaughter) had to be an intentional crime. Accordingly, we reverse the use of a weapon to commit a felony (manslaughter) conviction, vacate the sentence for that conviction, and remand the cause for a new trial on that charge. The remaining convictions and sentences are affirmed.

Affirmed in part, and in part reversed
and remanded for a new trial.